*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NORTHGATE LEELANAU PINES, LLC,

        Appellant,

v

TOWNSHIP OF CENTERVILLE and
CENTERVILLE TOWNSHIP PLANNING
COMMISSION,

        Appellees,

and

LAKE LEELANAU LAKE ASSOCIATION,

        Intervening Plaintiff-Appellee.

UNPUBLISHED
July 17, 2025
10:28 AM

No. 369786
Leelanau Circuit Court
LC No. 2023-010986-AA

Before: FEENEY, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

Northgate Leelanau Pines, LLC (Northgate) owns and operates the Leelanau Pines Campground, located in Centerville Township. Northgate proposed several renovations and upgrades to the campground that would require Special Land Use Permits. Northgate presented its plan to the Centerville Township Planning Commission, and Northgate's Special Land Use Permit application was denied. Northgate then appealed to the Centerville Township Zoning Board of Appeals (ZBA), which affirmed the Planning Commission's denial. The ZBA's denial was then affirmed by the circuit court. For the reasons set forth in this opinion, we also affirm.

## I. BACKGROUND

The land where the campground is situated is zoned "commercial-resort," and it is used as a campground as well as a marina. Northgate sought to approximately double the number of

campsites for seasonal recreational vehicles (RVs) and campers, add additional buildings and facilities, renovate existing facilities, and expand the existing marina.

As required by § 13.1 of the Centerville Township Zoning Ordinance, Northgate submitted an Application for Site Plan Review to obtain approval of its development plan. The site plan was required to comply with all applicable provisions of the Zoning Ordinance and 17 specific "Standards for Granting Site Plan Approval," which were contained in § 13.1.G of the Zoning Ordinance. Following a Centerville Township Planning Commission meeting, Northgate revised the site plan application to remove the marina expansion.

A public hearing was held concerning Northgate's proposed plan. Several members of the public commented in opposition of the proposal, and common concerns included the proposal's environmental impact, the effects of newly constructed buildings and impervious surfaces on stormwater drainage and runoff, whether the planned development was in accord with the character of the township and the Master Plan, as well as increased campfire smoke, noise, light, crowding, and traffic. Specific environmental concerns included problems with boats carrying invasive species to the lake and negative effects of development on the wetland ecosystem. The Planning Commission determined that the discussion would be continued at a subsequent special meeting.

Northgate subsequently provided responses to general concerns raised at the public hearing, and Northgate modified the application a second time before the next Planning Commission special meeting was held approximately a month later. In the second modified application, Northgate removed its request for a future phase of further additional campsites beyond the additional campsites Northgate was proposing to create immediately.[1] According to its written response document, Northgate believed that this "reduction of 113 campsites" would "improve the tree preservation, screening, buffering, and should adequately address the public concerns associated with additional vehicle traffic and boating impacts."

In response to concerns about the number of trees to be removed and the proposed development's impact on sensitive wetlands and the shoreline, Northgate responded that it had submitted drawings showing the "tree preservation areas" and that any proposed impacts on wetlands or shoreline were governed by the permitting process set forth by the Michigan Department of Energy, Great Lakes, and Environmental Quality (EGLE). Northgate also stated that it would strive to protect the shoreline and wetlands by preserving current stormwater runoff patterns and following requirements of the Leelanau County Drain Commission, that the boat wash facilities would be mandatory for boats entering the lake, that there would be strictly enforced quiet hours from 10:00 p.m. to 8:00 a.m. to mitigate noise concerns, and that Northgate's goal was to always be "fully occupied." In response to questions about precautions—such as additional landscaping or buffering—that would be implemented to minimize or prevent noise, sound, odors, and campfire smoke from carrying to neighboring residential properties, Northgate said that it

---

[1] There were approximately 170 existing campsites. Northgate proposed creating 172 new campsites along with a request to create 113 more campsites at some point in the future. It appears that Northgate removed its request to create the 113 additional campsites in the future, but maintained its request to presently create approximately 172 new campsites.

would "maintain the current landscape buffer with enhancements in key areas to minimize visual impact."

Additionally, there would be "limited" artificial outdoor lighting "to enhance the camping experience and improve safety." Outdoor lighting would be low-intensity, dark-sky approved, and limited to areas where it was necessary for safety. Relying on a traffic assessment completed by the Leelanau County Road Commission, Northgate maintained that the existing road network had adequate capacity to accommodate the increased traffic from the proposed campground expansion. Northgate stated that its campground use was consistent with the rural character of the area and preservation of the natural environment.

Northgate also further modified its application to reflect wider roads in compliance with fire requirements, modified the "geometry of the entrance [] based on recommendations of the Road Commission,"o modified the boat slip configuration in rebuilding and repairing the existing marina and boat launch area, and showed the boat wash station.

At the special meeting, members of the planning commission specifically asked Northgate's representatives how many total trees or acres of trees would be removed in the proposed plan, as well as how many trees would be removed along the shoreline. Northgate's representatives indicated that the intention was to "preserve as many trees as possible" and directed the Planning Commission to the landscape plan that had been submitted, which showed "areas where trees will be preserved, and areas where trees will be planted." However, a Northgate representative acknowledged that a full tree survey had not been completed and that the actual number of trees to be removed had not been quantified. The Planning Commission also asked whether Northgate's proposed buffers between the campground and neighboring properties would "provide buffering from noise, odors, smoke, and other nuisances." Northgate's representative referred the Planning Commission to the landscape plan and indicated that the trees that were to be retained would sufficiently mitigate nuisances. The Planning Commission also allowed further public comment. During the public comment period, concerns were expressed regarding a lack of information in the application relative to stormwater runoff, tree removal, and the effects of tree removal on the environment. Further concerns about noise and protecting the environment were expressed.

The Planning Commission indicated that it did not have all the necessary information to make a decision on the application and asked Northgate if it would agree to a 90-day extension of the review period. Northgate indicated that it was not prepared to address that question. The matter was tabled until the next regular meeting of the Planning Commission.

Before the next meeting, Northgate updated its application and site plan again. These revisions included a mandatory boat washing station to eliminate invasive species, the elimination of 13 existing campsites near the lakefront to improve scenic views, and supplemental shoreline tree plantings to improve future scenic views. Northgate also provided a further written response to concerns that had been raised. Northgate indicated that it had addressed concerns about increased boat traffic by declining to add more boat slips, consolidating two existing boat launches into one boat launch, and adding a controlled access check-in building and gate near the main entrance to prevent anyone other than registered campground guests from using the boat launch. Northgate addressed the concern about invasive species by including a mandatory boat washing

station in the site plan with educational signs about proper boat washing protocol. Northgate further indicated that it removed the patio near the shoreline that had originally been planned, was complying with the shoreline setback requirements, planned to plant eight additional trees along the shoreline, would work with EGLE to follow best management practices with respect to the shoreline, and removed plans for an elevated boardwalk and fishing piers to alleviate concerns about the negative impacts of those features on the wetlands.

At the next Planning Commission meeting, Northgate indicated that it was not willing to agree to the 90-day extension requested by the Planning Commission and was only willing to agree to an extension of 12 days. After further discussion of Northgate's application, the Planning Commission voted to deny the application. The Planning Commission concluded that Northgate's application did not satisfy any of the 17 standards in § 13.1.G of the Zoning Ordinance. The Planning Commission adopted written findings on each standard.

The first standard provided:

> All elements of the site plan shall be harmoniously and efficiently organized in relation to topography, the size and type of the lot, the character of adjoining property and the type and size of buildings. The site shall be so developed as not to impede the normal and orderly development or improvement of surrounding property for uses permitted in this Ordinance.

Regarding this standard, the Planning Commission found that Northgate's plan did not provide sufficient information and detail to demonstrate that this standard was met in light of the extensive wetlands and did not provide sufficient detail to show how noise, odor, campfire smoke, light, and other nuisances would be effectively screened from reaching neighboring properties.

The second standard provided:

> The landscape shall be preserved in its natural state, insofar as practical, by minimizing tree and soil removal, and by topographic modifications which result in maximum harmony with adjacent areas.

The Planning Commission found that this standard was not met because Northgate's plan did not sufficiently detail or quantify the planned tree removal or topographical modifications for development areas.

The third standard provided:

> Site plans shall fully conform with the published surface water drainage standards of the County Drain Commission.

The Planning Commission found that Northgate had not submitted adequate evidence of County Drain Commission assurance or approval, stormwater management calculations, or sufficient detail to determine the effectiveness of the proposed stormwater management plan. The Planning Commission also found that the fourth standard, which provided that "Special attention shall be given to proper site drainage so that removal of storm waters will not adversely affect neighboring property owners," was not satisfied for essentially the same reason.

The fifth standard provided:

> The site plan shall provide reasonable, visual and sound privacy for all dwelling units located therein and adjacent parcels. Fences, walks, barriers and landscaping shall be used, as appropriate, for the protection and enhancement of property and for the privacy of its occupants.

The Planning Commission determined that this standard was not met because Northgate did not provide adequate plans to mitigate the impact of nuisance sound and light or to show that visual privacy would be protected along boundaries with neighboring properties.

The sixth standard provided:

> All buildings or groups of buildings shall be so arranged as to permit emergency access by some practical means to all sides.

The Planning Commission found that this standard was not met because the application did not demonstrate conformance with local fire safety requirements or written assurance of fire and rescue department review.

The seventh standard provided:

> If there is a pedestrian circulation system, it shall be insulated as completely as reasonably possible from the vehicular circulation system.

With respect to this standard, the Planning Commission found that the application did not adequately show that the pedestrian circulation would be sufficiently insulated from the vehicular traffic.

The eighth standard provided:

> All [l]oading and unloading areas and outside storage areas, including areas for the storage of trash, which face or are visible from residential districts or public thoroughfares, shall be screened, by a vertical screen consisting of structural or plant material no less than six feet in height.

The Planning Commission found that the application did not adequately show compliance with this standard.

The ninth standard provided:

> Exterior lighting shall be arranged so that it is deflected away from adjacent properties and so that it does not impede the vision of traffic along adjacent streets.

The Planning Commission also found that the application did not sufficiently demonstrate that exterior lighting would be effectively deflected from adjacent properties or effectively protective of the dark night sky.

The tenth standard provided:

The arrangement of public or common ways for vehicular and pedestrian circulation shall respect the pattern of existing or planned streets and pedestrian or bicycle pathways in the area. Streets and drives which are a part of an existing or planned street pattern which serves adjacent development shall be of a width appropriate to the traffic volume they will carry and shall have a dedicated right-of-way equal to that specified by the County Road Commission.

The Planning Commission apparently found that this standard was not met for the same reasons that the seventh standard was not met.[2]

The eleventh standard provided:

All streets shall be developed in accordance with the Centerville Township Private Road Ordinance or the Leelanau County Road Commission specifications as required.

The Planning Commission found that the application failed to adequately demonstrate compliance with this standard.

The twelfth standard provided:

Site plans shall fully conform to the driveway and traffic safety standards of the Michigan Department of Transportation and/or the County Road Commission.

Regarding this standard, the Planning Commission found that the traffic study submitted by Northgate demonstrated an unacceptable increase in the amount of traffic even though the study also concluded that the current road system could accommodate the increase. The study projected a weekly "4.6-fold increase in traffic associated with Friday check-in and Monday check-out times."

The thirteenth standard provided:

Site plans shall fully conform to the applicable fire safety and emergency vehicle access requirements of the State Construction Code and/or local Fire Chief requirements.

This standard was found unmet for the same reasons as the sixth standard.

The fourteenth standard provided:

---

[2] The record is somewhat unclear regarding this standard. This portion of the written motion that the Planning Commission adopted at its October 3, 2022 meeting is crossed out, but there is nothing in the minutes to suggest that this portion of the motion was not adopted.

Site plans shall fully conform to the County Soil Erosion and Sedimentation Control Ordinance.

The Planning Commission apparently found that the application failed to satisfy this standard for the same reasons as the third standard.[3]

The fifteenth standard provided:

Site plans shall fully conform to the requirements of the Michigan Department of Public Health and the District Health Department.

The Planning Commission found that the application did not satisfy this standard because Northgate had not provided sufficient information to demonstrate that there was an adequate sewage treatment plan to support the proposed expansion and to assess any potential related environmental impact.

The sixteenth standard provided:

Site plans shall fully conform to all applicable state and federal statutes.

The Planning Commission found that this standard was not satisfied because there was a likelihood of pollution and environmental harm that would violate Michigan statutes.

The seventeenth standard provided:

Site plans shall conform to all applicable requirements of local, state and federal statutes and approval shall be conditioned on the applicant receiving necessary state and federal permits before final site plan approval or an occupancy permit is granted.

With respect to this standard, the Planning Commission found that the application did not sufficiently demonstrate compliance with this standard, and conditional approval could not be granted, because "the application has not adequately demonstrated that the project as proposed: a) would [e]nsure that public services and facilities affected by a proposed land use or activity will be capable of accommodating increased service and facility loads caused by the land use or activity; b) would protect the natural environment and conserve natural resources; c) would [e]nsure compatibility with adjacent uses of land; and d) would promote the use of land in a socially and economically desirable manner as required by Article XIII Section 13.1(H)(a) of the Zoning Ordinance." (Alterations in original.)

The Planning Commission further found generally that the proposed expansion of the campground was in direct conflict with the purpose of the Zoning Ordinance, which was to promote the health, safety, and welfare by preventing overcrowding and promoting orderly development. Additionally, the Planning Commission found that there were doubts about the

---

[3] This finding suffers from the same ambiguities explained with respect to the tenth standard.

general accuracy of the application because Northgate could not provide the true number of current campsites, the true number of campsites to be removed and added, and the true number of total campsites that would be present at the end of the expansion. The Planning Commission also found that the proposed expansion would violate several goals of the Centerville Township Master Plan, including the goals of preserving the peaceful and scenic character of the community, protecting waters and wetlands, and managing growth consistent with the Master Plan. Moreover, the Planning Commission found that the proposed development was inconsistent with the Master Plan's provision that expansion in the commercial/resort zoning district was not anticipated.

Northgate appealed to the ZBA. Although the ZBA reversed the Planning Commissions decisions with respect to the eighth and ninth standards, the ZBA otherwise affirmed the Planning Commission's findings and affirmed the Planning Commission's overall decision to deny Northgate's site plan application.

Northgate appealed to the Leelanau Circuit Court. The Lake Leelanau Lake Association's (LLLA) motion to intervene was granted. The circuit court issued a written opinion and order affirming the ZBA's overall decision to affirm the Planning Commission's denial of the site plan. The circuit court reversed the ZBA's determinations on the eleventh and sixteenth standards and affirmed the ZBA's decisions on the remaining standards. The circuit court found that the ZBA's determinations on those remaining standards were supported by competent, material, and substantial evidence on the record.

Northgate now appeals to this Court.

## II. STANDARD OF REVIEW

Our standard of review in this context is well settled and is deferential. Our Supreme Court has set forth the applicable standard of review:

> When reviewing a decision of a zoning board of appeals, a circuit court's review is "limited to whether the decision is authorized by law and supported by competent, material, and substantial evidence on the whole record." " 'Substantial evidence' is evidence that a reasonable person would accept as sufficient to support a conclusion. While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." The factual findings of a zoning board of appeals are entitled to deference. "A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record."

> This Court and the Court of Appeals review a circuit court's determinations regarding a zoning board of appeals' findings to assess whether the circuit court " 'applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the [zoning board of appeals'] factual findings.' " Whether a circuit court "misapprehended or grossly misapplied the substantial evidence test" is reviewed under a standard identical with the "clearly erroneous" standard. "A finding is clearly erroneous if the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been

-8-

made." [*Pegasus Wind, LLC v Tuscola Co*, 513 Mich 35, 44-45; 15 NW3d 108 (2024) (citations omitted; alteration in original).]

Nonetheless, although the standard of review regarding factual findings is deferential, this Court reviews de novo questions of law, such as the interpretation of the relevant law and its application to the facts. *Hughes v Almena Twp*, 284 Mich App 50, 60; 771 NW2d 453 (2009).

## III. ANALYSIS

Appellant contends that the rulings made by the planning commission, the zoning board of appeals and the circuit court lack backing from competent, material, and substantial evidence. Appellant urges this Court to reverse, focusing this Court's attention on scrutinizing the evidentiary basis that underpins these determinations and assessing whether the requisite legal standards were met in the decision-making processes. However, and contrary to appellant's request, our evaluation is limited to assessing whether the circuit court applied correct legal principals and whether it misapprehended or grossly misapplied the substantial evidence test to the ZBA's factual findings. *Pegasus Wind*, 513 Mich App at 44-45. Our task is not to reweigh the evidence and make our own factual findings, *id*. at 41, and we thus decline Northgate's invitation to do so.

The circuit court's review was defined by MCL 125.3606(1), which provides as follows:

> (1) Any party aggrieved by a decision of the zoning board of appeals may appeal to the circuit court for the county in which the property is located. The circuit court shall review the record and decision to ensure that the decision meets all of the following requirements:
>
> (a) Complies with the constitution and laws of the state.
>
> (b) Is based upon proper procedure.
>
> (c) Is supported by competent, material, and substantial evidence on the record.
>
> (d) Represents the reasonable exercise of discretion granted by law to the zoning board of appeals.

The Michigan Zoning Enabling Act (MZEA) permits a local government to "require the submission and approval of a site plan before authorization of a land use or activity regulated by a zoning ordinance." MCL 125.3501(1). "A decision rejecting, approving, or conditionally approving a site plan shall be based upon requirements and standards contained in the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes." MCL 125.3501(4). "A site plan shall be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes." MCL 125.3501(5).

Here, the Planning Commission determined that Northgate had failed to meet its burden of providing sufficient information in its site plan and supporting documentation to demonstrate that it met each of the conditions imposed by the zoning ordinance. MCL 125.3501(5). Notably, the application for site plan review specifically directed Northgate to provide written statements regarding the impact the project would have on existing infrastructure and the natural environment of the site and adjoining lands. Northgate was therefore on notice that this information was required. As detailed in the background section of this opinion, the Planning Commission found Northgate's submissions to be lacking sufficient information and detail to permit the Planning Commission to find that Northgate's application met the requirements of the Zoning Ordinance.

The ZBA affirmed the Planning Commission's findings on all but two of the 17 conditions set forth in the Zoning Ordinance. The circuit court in turn reversed the ZBA's findings on two more conditions while affirming on the remaining conditions. The circuit court affirmed the ZBA's decision affirming the Planning Commission's denial of Northgate's application. Section 13.1.G of the Zoning Ordinance requires all 17 conditions to be satisfied before approval may be granted. The circuit court properly set forth the standard of review it was to apply and evaluated whether the ZBA's decision was authorized by law and supported by competent, material, and substantial evidence on the whole record. *Pegasus Wind*, 513 Mich at 44. Based on our review of the record, we are not convinced that the circuit court clearly erred in applying the substantial evidence test. *Id*. at 45. Although Northgate appears to argue that it somehow was *entitled* to at least conditional approval of its plan, § 13.1.H.a of the Zoning Ordinance specifically states that conditional approval is discretionary with the Planning Commission. Finally, to the extent Northgate complains about the lack of supporting evidence, that evidentiary deficiency is the direct result of Northgate's failure to submit the evidence into the record necessary to demonstrate its satisfaction of the requirements to obtain approval of its site plan.

Affirmed. Appellees' having prevailed in full are entitled to costs. MCR 7.219(A).


/s/ Kathleen A. Feeney
/s/ Stephen L. Borrello
/s/ Anica Letica